## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GINA MAY HARPER**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02:13-cv-00446 |
| | ) | |
| **CAROLYN W. COLVIN**, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

March 27, 2014

### I.    Introduction

Plaintiff, Gina May Harper, brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c), for judicial review of the final determination of the Commissioner of Social Security ("Commissioner") which denied her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-403; 1381-1383(f).

### II.    Background

#### A.    Facts

Plaintiff was born on May 21, 1977.  (R. 42).  She graduated from high school and thereafter received training to become a certified nursing assistant ("CNA").  (R. 42-43).  She has past relevant work experience as a fast food worker (light, unskilled work); bartender (light, semi-skilled work); van driver (medium, semi-skilled work); and CNA (medium, semi-skilled work).

Plaintiff alleges disability as of October 27, 2009, due to major depression, post-traumatic stress disorder ("PTSD") from a van accident in which Plaintiff was involved when she was five years old; anxiety; and lower back pain radiating down her legs. She has not engaged in substantial gainful work activity since her alleged onset date.

### 1. Physical Impairments

Plaintiff has a history of chronic pain in her hips, shoulders, and legs. Dylan Deatrich, M.D.,[1] served as Plaintiff's primary care physician from January 2009 to November 2010. (R. 284-339, 368-93, 486-519). Plaintiff began seeing Dr. Deatrich on January 26, 2009, at which time she complained of lower back pain and right shoulder pain, which had been present for years. (R. 321). She also reported occasional pain radiating into her hips and down the back of her legs. (R. 321). Dr. Deatrich recommended physical therapy, ordered x-rays, and prescribed Ultram and Lodine to manage Plaintiff's pain. (R. 322). The x-rays were performed a few days later and were unremarkable. Nevertheless, on January 30, Dr. Deatrich prescribed Plaintiff with Vicodin for use only with severe pain. (R. 319).

Thereafter, Plaintiff received in-office care from Dr. Deatrich only a few times, but did phone into the office several times to request refills for her pain medications. (R. 296, 298-99, 375, 378-79, 382-83, 497-502). She also cancelled or missed several appointments. (R. 295, 297, 377, 503). During her April 23, 2010, visit, Plaintiff complained—for the first time—of depression and anxiety and indicated that she was currently seeing a therapist. (R. 380). Consistent with those complaints, Dr. Deatrich completed a Pennsylvania Department of Welfare Medical Assessment Form in which he indicated that Plaintiff was temporarily disabled due to depression with anxiety. (R. 391).

---

[1] Dr. Deatrich did not provide a medical opinion as to the work-preclusive effects of any of Plaintiff's physical impairments.

On November 4, 2010, Plaintiff was informed that she would be discharged from Dr. Deatrich's office for violating her drug contract because a drug screening had returned negative for Vicodin but positive for cocaine and marijuana. (R. 492-93, 513). Plaintiff later told her psychiatrist, Melissa Albert, M.D., that she was upset that Dr. Deatrich considered her to be a drug user and that she believed she tested positive for illicit substances because she had been unwittingly drugged at a Halloween party. (R. 690).

In February 2011, Plaintiff established care with Amy Diamond, M.D.,[2] from whom she received treatment until October 2011. (R. 610-57). At a handful of office visits during this six-month period, Dr. Diamond recorded normal physical examination findings and noted that Plaintiff appeared alert and oriented. (R. 612-13, 624-35, 640-41, 646, 654-55). She diagnosed Plaintiff with migraine headaches, gastritis, myalgia, fatigue, anxiety, leg cramps, PTSD, depression, and chronic sinusitis. (R. 611). She also indicated at times that Plaintiff was reluctant to speak and was tearful. (R. 627). In September 2011, Plaintiff began seeing a pain management specialist at the request of Dr. Diamond. (R. 50).

In March 2011, Plaintiff underwent a lumbar spine MRI, which revealed multiple levels of degenerative disk disease with left paracentral disk protrusion causing moderate left neutral foraminal stenosis and mild spinal stenosis. (R. 615-16). A brain MRI revealed mastoid sinus disease, mild prominence of the adenoid tissue, and no acute intercranial abnormality or enhancing mass lesion. (R. 617-18). Furthermore, the results of an abdominal ultrasound were unremarkable. (R. 619-20). In June 2011, Plaintiff underwent EMG studies which showed no evidence of radiculopathy, plexopathy, neuropathy, or myopathy. (R. 622-23). A sleep study revealed mild obstructive sleep apnea. (R. 633-39).

---

[2] Dr. Diamond did not provide a medical opinion as to any of Plaintiff's physical impairments.

## 2. Mental Impairments

Plaintiff sought mental health treatment from Cornerstone Care in January 2010, with complaints of feeling overwhelmed, depressed, and helpless.[3] (R. 276). On January 12, 2010, she underwent an intake/assessment interview with Susan Swala, LSCW, who diagnosed Plaintiff with major depressive disorder, borderline intellectual functioning, and borderline personality disorder and assessed a current GAF score of 50. (R. 278). Thereafter, Plaintiff attended monthly counseling sessions at Cornerstone with Swala. (R. 275-283).

On May 25, 2010, Plaintiff underwent her first psychiatric evaluation with Dr. Albert. (R. 701). Plaintiff reported significant anxiety and mood symptoms. (R. 701). Dr. Albert noted that Plaintiff appeared mildly disheveled and restless. (R. 704). Furthermore, she spoke in a soft tone and displayed a sad mood and anxious affect. (R. 704). Dr. Albert considered Plaintiff's attention intact and indicated that her intellectual capacity appeared average, as she displayed fair judgment and insight. (R. 704). Dr. Albert diagnosed Plaintiff with social phobia, generalized anxiety disorder, and major depressive disorder, recurrent severe with a personality disorder. (R. 278). She also assessed a GAF of 52, started Plaintiff on several medications, and requested neuropsychological testing for assessment of Plaintiff's cognitive abilities.

On June 16-21, 2010, Plaintiff underwent neuropsychological testing with Lisa Lewis, Ph.D. (R. 658-725). Plaintiff scored a full-scale IQ of 59 on the WAIS-IV. (R. 678). On the Repeatable Battery for the Assessment of Neuropsychological Status, Dr. Lewis reported that Plaintiff "also attained extremely low scores, consistent with a diagnosis of MR." (R. 679). Dr. Lewis noted in her findings that Plaintiff was patient and cooperative. (R. 678). Moreover,

---

[3]     The intake interview at Cornerstone noted that Plaintiff had previously been treated at this facility from 2002 through 2008 and at Greene County Mental Health from 2002 through 2004. Plaintiff was also hospitalized in 2003 after a suicide attempt.

according to Dr. Lewis, Plaintiff appeared to give every task good effort. (R. 678).

Consistent with the results of Dr. Lewis' testing, at subsequent office visits, Dr. Alberts' diagnosis shifted from borderline intellectual functioning to mild mental retardation. At the same time, Dr. Albert reported that Plaintiff was well-groomed, maintained good eye contact, and was cooperative. Her motor activity was typically calm, her mood was okay to irritable, and she had an irritable or anxious affect. She also displayed normal goal-directed thinking, and mildly impaired to sound judgment/insight. Moreover, throughout this time, Plaintiff's GAF score was typically between 52 and 60, with a high of 63. On November 8, 2011, Dr. Albert completed a mental impairment questionnaire in which she indicated that Plaintiff had moderate restrictions of activities of daily living; extreme difficulties in maintaining social functioning; and extreme difficulties in maintaining concentration, persistence or pace. She also indicated that Plaintiff would experience four or more episodes of decompensation within a 12-month period, each of which would last at least two weeks and that Plaintiff's impairments would cause her to be absent from work four or more days per month. (R. 676-77).

### B. Procedural History

Plaintiff protectively filed an application for DIB/SSI on December 30, 2009. The claims were initially denied on August 27, 2010. (R. 11). Plaintiff filed a written request for a hearing on October 1, 2010, and a hearing was held on November 16, 2011 before Administrative Law Judge James Bukes ("ALJ"). (R. 11). Plaintiff was represented by a non-attorney representative and testified at the hearing. (R. 11). Alina Kurtanich, an impartial vocational expert ("VE"), also testified. (R. 11).

On December 20, 2011, the ALJ issued a decision in which he denied Plaintiff benefits. The ALJ's decision became the final decision of the Commissioner on January 24, 2012, when

the Appeals Council denied Plaintiff's request for review.

Plaintiff filed her Complaint in this Court on March 27, 2013, which seeks judicial review of the ALJ's decision. Defendant filed an Answer on June 14, 2013. The parties then filed cross-motions for summary judgment, which have been fully briefed and are ripe for disposition.

## III.  Legal Analysis

### A.     Standard of Review

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); *Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent her from performing his past relevant work; and (5) if the claimant is incapable of performing her past relevant work, whether she can perform any other work which exists in the national economy. 20 C.F.R. § 404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24–25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner

to prove that, given claimant's mental or physical limitations, age, education, and work experience, she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)(3), 1383(c)(3)(4); *Schaudeck v. Comm'r Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based. *See* 5 U.S.C. § 706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision or re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196–97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory

interpretations that an agency manifests in the course of making such findings." *Monsour Med. Cntr. v. Heckler*, 806 F.2d 1185, 90–91 (3d Cir. 1986).

**B.    The ALJ's Decision**

At step 1 of the sequential evaluation, the ALJ found that Plaintiff has not engaged in substantial gainful activity since her alleged onset date.  (R. 13).  At step 2, the ALJ determined that the Plaintiff has the following severe impairments: chronic musculoskeletal pain complaints and degenerative disc disease of the lumbar spine, status-post left foot fracture; obesity; borderline intellectual functioning; depression; anxiety; and a personality disorder. (R. 14). In the ALJ's view, however, none of Plaintiff's impairments met the criteria of any of the listings of impairments.  (R. 14-22).  He paid particular attention to Listing 12.05 ("intellectual disability"), as Plaintiff's non-attorney representative specifically argued that Plaintiff's full-scale IQ score of 59 placed her squarely within the requirements of that listing.  (R. 16-17).  The ALJ disagreed, having concluded that Plaintiff's low IQ was not consistent with her actual level of intelligence. (R. 16).  He also found that Plaintiff failed to show that she experienced deficits in adaptive functioning prior to the age of 22, which the ALJ considered a threshold requirement for meeting the criteria of Listing 12.05.  (R. 16).  The ALJ also considered whether Plaintiff's mental impairments met the criteria of Listings 12.04, 12.05, or 12.08.  (R. 18).  Finding that Plaintiff failed to display marked limitations in daily living; maintaining social functioning; maintaining concentration, persistent or pace; or repeated periods of decompensation, the ALJ concluded that Plaintiff failed to fully satisfy any of those listings.  (R. 18).

Having determined that Plaintiff failed to satisfy the criteria of any of the listed impairments, the ALJ went on to determine that Plaintiff retained the RFC

> [t]o perform light work with lifting of 20 pounds occasionally and 10 pounds frequently but [she] should have a sit/stand option that allows her to alternate

sitting with standing every hour. In addition, she is limited to simple instructions and to very simple decision-making. Moreover, she should avoid work in close coordination with or proximity to others; avoid crowds and groups of people; avoid intensive supervision; avoid changes in work setting; and avoid assembly line pace work.

(R. 23). In arriving at that assessment, the ALJ found that Plaintiff's impairments would be expected to cause some of her alleged symptoms, but concluded that the evidence did not substantiate her statements regarding the intensity, persistence, and limiting effects of her symptoms. (R. 25). The ALJ also determined that Plaintiff's credibility was undermined by her history of drug dependency and use of illegal drugs. (R. 30). Furthermore, although the ALJ considered all of the medical evidence of record, including the opinions, findings and treatment notes from Plaintiff's primary care physicians, Drs. Deatrich and Diamond; her psychiatrist, Dr. Albert; the neuropsychological evaluator, Dr. Lewis; and the physical and mental consultative examiners, Raymond Nino, M.D., and Thomas Andrews, Ph.D., he rejected some of their opinions because he found them inconsistent with the evidence of record and with the activities of daily living that Plaintiff reported. He also concluded that the opinion of the state agency psychologist John Rohar, Ph.D., who opined that Plaintiff had only moderate limitations across the board, was consistent with the totality of the evidence, and thus, incorporated Dr. Rohar's findings into his RFC.

At step 4, the ALJ determined that Plaintiff could not perform any past relevant work. (R. 30-31). However, at step 5, with the assistance of the VE's testimony, the ALJ concluded that given Plaintiff's age, education, work experience, and RFC, there are a significant number of jobs in the national economy that Plaintiff can perform: mail clerk (170,000 positions), garment sorter (280,000 positions), and marker (160,000 positions). Accordingly, the ALJ held that Plaintiff was not disabled within the meaning of the Act since her alleged onset date and denied

her claim for benefits.  (R. 32).

### C.    Discussion

As set forth in the Act and applicable case law, this Court may not undertake a *de novo* review of the ALJ's decision or re-weigh the evidence of record.  *Monsour*, 806 F.2d at 1190. The Court must simply review the findings and conclusions of the ALJ to determine whether they are supported by substantial evidence. *Schaudeck*, 181 F.3d at 431.

In support of her motion for summary judgment, Plaintiff raises two related issues, arguing that the ALJ erred in evaluating the medical opinions of record and rejecting the opinions of Plaintiff's treating physician without adequate articulation.[4]  For her part, the Commissioner contends that the ALJ's decision is supported by substantial evidence.   In particular, the Commissioner argues that the ALJ properly found that Plaintiff did not meet the requirements of listing 12.05 ("intellectual disability"); adequately incorporated all of Plaintiff's functional limitations into his RFC assessment; and, in turn, correctly concluded that Plaintiff was not disabled within the meaning of the Act upon consideration of the VE's testimony.  The Court will first consider whether substantial evidence supports the ALJ's holding that Plaintiff did not satisfy the elements of Listing 12.05 ("intellectual disability") and then turn to Plaintiff's arguments regarding the ALJ's treatment of the opinion evidence in the record.

   1.    *The ALJ properly found that Plaintiff did not meet the requirements of Listing 12.05.*

The ALJ concluded at Step 3 of the sequential evaluation that Plaintiff's impairments did not meet or medically equal the criteria of any of the listed impairments, particularly Listing

---

[4]      Plaintiff also argues that her claim was not barred by *res judicata*, apparently anticipating that the Commissioner would raise this issue in support of her motion for summary judgment since it was raised as an affirmative defense in the Commissioner's Answer.  The Commissioner, however, did not raise a *res judicata* argument in her brief, so the Court will not address that portion of Plaintiff's argument herein.

12.05 ("intellectual disability"). The Commissioner argues that the ALJ's decision was supported by substantial evidence and thus should not be disturbed. Before reaching the issue of whether the ALJ's fact-finding was supported by substantial evidence, the Court first must determine whether the ALJ's interpretation of the requirements of Listing 12.05 was correct. While Plaintiff has not explicitly raised this argument, insofar as the ALJ applied an incorrect legal standard, his decision would be subject to remand.

Listing 12.05 contains two parts: an introductory paragraph and a set of four criteria for determining whether the required level of severity for the disorder has been established. 20 C.F.R., Pt. 404, Subpt. P, App'x 1, § 12.05. The introductory paragraph contains a "capsule definition" for the disorder:

> intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

*Id.* As relevant to Plaintiff's claim, the Listing proceeds to say that the requisite level of severity is established if a claimant has "[a] valid verbal, performance, or full scale IQ of 59 or less." 20 C.F.R., Pt. 404, Subpt. P, App'x 1, § 12.05B.

At the hearing before the ALJ, Plaintiff's representative argued that Plaintiff met the requirements of Listing 12.05B because she was determined to have a full scale IQ of 59 during the neuropsychological testing conducted in June 2010 and thereafter consistently diagnosed as mildly mentally retarded by her psychiatrist, Dr. Albert. (R. 15). The ALJ disagreed for two reasons. (R. 16-17). First, the ALJ concluded that Plaintiff's full scale IQ score of 59 was not a "true reflection of [her] intellectual disabilities." (R. 16). Second, he determined that even if Plaintiff's IQ score were consistent with the other evidence of record, Plaintiff failed to satisfy all of the remaining requirements of the listing because "the evidence d[id] not demonstrate

deficits in adaptive behaviors prior to or subsequent to age 22 as required for all listings under Section 12.05." (R. 17). Essentially, the ALJ interpreted Listing 12.05 as having two independent components, each of which must be met in order to support a finding of *per se* disability. First, a claimant must provide evidence of "a diagnosis of mental retardation that refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." (R. 16). Then, a claimant must satisfy any one of the four criteria in A through D. (R. 16). In other words, in the ALJ's view, having an IQ of 59 or lower is not alone sufficient to satisfy all of the requirements of the Listing.

The Court agrees with the ALJ's interpretation of the Listing. First of all, his view is consistent with the Commissioner's own view on this issue, as set forth in the introductory material to the listings. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §12.00A (emphasis added) ("If [a claimant's] impairment satisfied the diagnostic description in the introductory paragraph [of § 12.05] *and* any one of the four sets of criteria, we will find that [the claimant's] impairment meets the listing."). The ALJ's interpretation is also consistent with view endorsed by an overwhelming majority of courts in this Circuit, including the Court of Appeals.[5] *See, e.g., Gist*

---

[5]     At least one member of this Court has held that a claimant is not "required to prove deficits in adaptive functioning as an additional requirement" of § 12.05. *Brown v. Comm'r of Soc. Sec.*, No. 08-1265, 2009 WL 3087220, at *11 (W.D. Pa. Sept. 23, 2009) (Conti, C.J.). In so doing, Chief District Judge Conti relied on *Markle v. Barnhart*, 324 F.3d 182, 187 (3d Cir. 2003), where the Court of Appeals held that in order to meet the requirements of §12.05C, a claimant "must i) have a valid, verbal performance or full scale IQ score of 60 through 70, ii) have a physical or other mental impairment imposing additional and significant work-related limitations of function, and iii) show that the mental retardation was initially manifested during the developmental period (before age 22)." In Chief Judge Conti's view, the court in *Markle* established a three-prong test for establishing a finding of *per se* disability under § 12.05C, and requiring a claimant to show "'deficits in adaptive functioning' as a separate requirement" would run afoul of our appellate court's instructions. *Brown*, 2009 WL 3087220, at *10. The undersigned respectfully disagrees that requiring a claimant to show "deficits in adaptive

v. *Barnhart*, 67 F. App'x 78, 81 (3d Cir. 2003) ("In order to meet or equal listing 12.05, a claimant must prove that she experiences 'deficits in adaptive functioning' with an onset prior to the age of 22. She must also show that she meets the requirements listed in subsections A, B, C, or D of that section."); *Cortes v. Comm'r of Soc. Sec.*, 255 F. App'x 646, 651 (3d Cir. 2007) (To meet the listing for mental retardation, the claimant must prove, *inter alia*, "subaverage general intellectual functioning with deficits in adaptive functioning" manifesting before age 22); *Logan v. Astrue*, No. 07-1472, 2008 WL 4279820, at *7 (W.D. Pa. Sept. 16, 2008) (Fischer, J.) ("In this Court's estimation, the law is clear that any claimant seeking to establish that she suffers from a disability under Listing 12.05C must satisfy the capsule definition of § 12.05 . . ."). Likewise, every Court of Appeals that has directly addressed the question has endorsed the interpretation adopted by the ALJ. *See, e.g.*, *Libby v. Astrue*, 473 F. App'x 8, 9 (1st Cir. 2012); *Talavera v. Astrue*, 697 F.3d 145, 153 (2d Cir. 2012); *Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012); *Randall v. Astrue*, 570 F.3d 651, 660 (5th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th

---

functioning" would be in any way inconsistent with *Markle*. As Senior District Judge Diamond recently explained, "Although not specifically mentioning the need to establish 'deficits in adaptive functioning,' *Markle* did expressly hold that a claimant must show 'mental retardation' manifested before age 22, and Listing 12.05 explicitly states that 'mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning.' Accordingly, it is this Court's interpretation of that *Markle* is wholly consistent with the subsequent decisions in *Gist* . . . as well as with the clear and unequivocal pronouncement made in the explanatory notes to the mental disorder listings in 12.00A." *Landsdowne v. Astrue*, No. 11-487, 2012 WL 4069363, at *4 n.4 (W.D. Pa. Sept. 17, 2012).

Furthermore, although the undersigned has previously cited the decision in *Brown* with approval, it did so in a case where the issue was whether the ALJ improperly discounted the plaintiff's IQ score, not whether the evidence showed the necessary "deficits in adaptive functioning." *Schmidt v. Comm'r of Soc. Sec.*, No. 09-707, 2009 WL 5206019, at *9-10 (W.D. Pa. Dec. 23, 2009), the issue in that case was. In any case, *Schmidt* is not binding. *See Camreta v. Green*, --- U.S. ----, 131 S. Ct. 2020, 2033 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.") (internal quotation marks omitted). And no matter what this Court has previously said on this issue, the prevailing interpretation of Listing 12.05 in this Circuit and around the country clearly requires a claimant to show "deficits in adaptive functioning" as a threshold requirement.

Cir. 2001); *Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007); *Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006); *Wall v. Astrue*, 561 F.3d 1048, 1062 (10th Cir. 2009); *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). Having decided that the ALJ was correct in requiring Plaintiff to satisfy the capsule definition in Listing 12.05 in addition to the IQ-requirement, the Court must now consider whether substantial evidence supports his finding that Plaintiff did not meet either of those criteria.

The ALJ first found that Plaintiff failed to demonstrate that she suffered from the necessary "deficits in adaptive functioning." In general, that phrase "denotes inability to cope with the challenges of ordinary everyday life." *Novy*, 497 F.3d at 710. The regulations, however, do not "provide any standards or guidelines by which to assess and measure the existence or severity of a claimant's alleged deficits." *Thomas v. Colvin*, No. 13-267, 2014 WL 584048, at *9 (W.D. Pa. Feb. 14, 2014). In the commentary material issued along with 2002 rules revising the listing of impairments, the Social Security Administration ("SSA") explained that the phrase was purposefully left open-ended. *See Technical Revisions to Medical Criteria for Determination of Disability*, 67 FR 20018-01 (Apr. 24, 2002). As the SSA recognized, each of the four leading professional mental health organizations defines "intellectual disability" in a slightly different way. *Id.* "While all the definitions require significant deficits in intellectual functioning, as evidenced by IQ scores of approximately 70 or below, age of onset and the method of measuring the required deficits in adaptive functioning differ among the organizations." *Id.* In revising Listing 12.05, the SSA declined to endorse "the methodology of one professional organization over another" and instead continued to "allow[] the use of any of the measurement methods recognized and endorsed by the professional organizations."[6] *Id.*

---

[6] According to the DSM-IV, promulgated by the American Psychiatric Association

In this case, the ALJ did not employ one of the standards recognized by the professional organizations but instead improvised his own definition: "Adaptive behaviors of daily living include cleaning, shopping, cooking, using public transportation, paying bills, personal grooming and hygiene, maintaining a residence, using telephone directories, and using a post office." (R. 17). In doing so, he seems to have borrowed from the definition of "activities of daily living" found at 20 C.F.R., Part 404, Subpart P, § 12.00C. Under a rule followed by a few District Courts in this Circuit, the ALJ's failure to "identify[] and apply[] one of the four standards of measurement used by one of the professional organizations" discussed in *Diagnostic and Statistical Manual of Mental Disorders, Text Revision* would constitute reversible error. *See Shaw v. Astrue*, No. 11–139J, 2012 WL 4372521, at *6 n.8 (W.D. Pa. Sept. 24, 2012) (citing *Grunden v. Astrue*, 2011 WL 4565502 (W.D. Pa., Sept. 29, 2011); *Logan v. Astrue*, 2008 WL 4279820 at *8 (W.D. Pa. Sept. 16, 2008)). This Court declines to adopt this rigid requirement. For one thing, as the Seventh Circuit Court of Appeals recently observed, none of the federal circuit courts have ever "recognized or established such a requirement." *Charette v. Astrue*, 508

---

("APA"), an individual displays "deficits in adaptive functioning" if she has "significant limitations in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety." *Diagnostic and Statistical Manual of Mental Disorders, Text Revision* (DSM–IV–TR) 41 (4th ed. 2000). The American Association of Mental Retardation ("AAMR") (now the American Association on Intellectual and Developmental Disabilities ("AAIDD")), utilizes the following standard: an individual qualifies as intellectually disabled if she has significant limitations in intellectual functioning and adaptive behavior as expressed in conceptual (*i.e.*, receptive and expressive language, reading and writing, money concepts, and self-direction); social (*i.e.*, interpersonal, responsibility, self-esteem, gullibility, naiveté, follows rules, obeys laws, and avoids victimization); and practical adaptive skills (*i.e.*, personal activities of daily living such as eating, dressing, mobility and toileting; instrumental daily activities of daily living such as preparing meals, taking medication, using the telephone, managing money, using transportation, and doing housekeeping activities; maintaining a safe environment, and occupational skills). *Logan*, 2008 WL 4279820 at *8 n.4 (citing *Manual of Diagnosis and Professional Practice in Mental Retardation* (American Association on Mental Retardation, 1993)).

F. App'x 551, 553 (7th Cir. 2013) (unpublished). Indeed, while the SSA has itself said that an ALJ is "allow[ed]" to use any of the four standards endorsed by the leading professional organizations, there is nothing in the regulations requiring him or her to do so. *See Technical Revisions to Medical Criteria for Determination of Disability*, 67 FR 20018-01 (Apr. 24, 2002). Moreover, while remand might be warranted in some cases in which an ALJ fails to articulate any standard whatsoever, leaving the reviewing court "to guess as to which standard the ALJ employed in his analysis," *Landsdowne v. Astrue*, No. 11–487, 2012 WL 4069363, at *5 (W.D. Pa. Sept. 17, 2012), this case presents a different scenario. The ALJ sufficiently explained the benchmark he used to arrive at his conclusion that Plaintiff did not have deficits in adaptive functioning before age 22. Although his standard may not have precisely mirrored any of the measures endorsed by the leading mental health organizations, it embraced the same concepts and appropriately honed in on the ultimate question: whether Plaintiff displayed an "inability to cope with the challenges of ordinary everyday life." *Novy*, 497 F.3d at 710. In this Court's view, that is enough to avoid the need for a remand.

Turning to the ALJ's application of that standard to the facts of Plaintiff's case, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff did not establish that she had the "deficits in adaptive functioning" that are necessary to satisfy Listing 12.05. As the ALJ explained in his decision, Plaintiff completed high school (having only attending special education classes in the ninth grade) and trained as a CNA; worked in jobs requiring some skill prior to the alleged onset date; cared for herself; raised her two sons; drives; shops for groceries; cleans her house (with reminders from her husband); and can manage her own finances. (R. 17). Furthermore, to the extent that Plaintiff did have issues in managing her activities, she attributed those issues to her stress and anxiety and not to any intellectual problems. Accordingly, the ALJ

was on solid ground in determining that Plaintiff could cope with life's daily rigors. *See Novy*, 497 F.3d at 710. (holding that plaintiff did not display deficits in adaptive functioning where "[s]he lives on her own, taking care of three children . . . without help, feeding herself and them, taking care of them sufficiently well that they have not been adjudged neglected and removed from her custody by the child-welfare authorities, paying her bills, avoiding eviction"). Since substantial evidence supports the ALJ's finding on this requirement, the Court need not consider whether the decision of the ALJ to discount Plaintiff's IQ score was proper.

2.      *The ALJ properly considered all of the opinion evidence of record.*

Plaintiff contends that the ALJ erred in rejecting the medical opinions of Drs. Albert, Lewis, Andrews, and Nino, relying on the so-called treating physician rule in support of her argument. Only Dr. Albert, however, actually qualifies as a treating source, as she is in the only one of these four medical sources who had "an ongoing treatment relationship with [Plaintiff]." 20 C.F.R. § 404.1502. The other three are considered nontreating sources since they each examined Plaintiff only once and, therefore, could not have developed the sort of longitudinal picture of Plaintiff's impairments typically associated with a treating source. *See id.* ("Nontreating source means a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you," including "State agency medical and psychological consultants[.]"); *Morgan v. Astrue*, No. 10–282, 2010 WL 3362755, at \*9 (W.D. Pa. Aug. 24, 2010) (classifying psychologist who performed neuropsychological testing on only two occasions as a nontreating source).

The distinction is critical because although an ALJ must consider every medical opinion in the record, not all opinions from medical sources are entitled to the same amount of weight. *See* 20 C.F.R. § 404.1527(c). It is well settled that an ALJ must accord a treating source's

opinions "great weight, especially when [they] reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987)). A treating source's opinion is entitled to controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); SSR 96–2p, 1996 WL 374188. Consequently, an ALJ may reject the opinion of a physician only if it is contrary to other medical evidence contained in the record, *see, e.g.*, *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988), or if it is insufficiently supported by clinical data, *see, e.g.*, *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d. Cir. 1985). Even if a treating source's opinion is not found to be controlling, "it is still entitled to deference." SSR 96-2P, 1996 WL 374188, at *4. On the other hand, opinions by nontreating sources are generally accorded less weight than opinions rendered by treating sources and are never entitled to controlling weight. *See* 20 C.F.R. § 416.927(c)(2); SSR 96-2P, 1996 WL 374188, at *2. As will be explained *infra*, the ALJ did not err in applying these principles to the any of the medical opinions in the record.

    a.    Dr. Albert

Plaintiff first argues that the ALJ erred in rejecting the opinions of Plaintiff's treating psychiatrist, Dr. Albert. In reaching his decision, the ALJ considered Dr. Albert's opinion that Plaintiff had extreme limitations in maintaining social functioning and maintaining concentration, persistence or pace but determined that they were not entitled to controlling weight for several reasons:

> [The treating physician] rule does not apply to statements of opinion upon the ultimate issue of disability, which is reserved to the Commissioner. Moreover, the foregoing opinions upon the issue of listing level impairments expressed by Dr. Albert, unaccompanied by any supporting explanation or rationale are similar

to form reports in which a physician's obligation is only to check a box or fill in a blank. Such conclusions are weak evidence at best. Moreover, the underlying treatment records do not support the assessment of extreme limitations in social functioning and maintaining concentration, persistence, and pace as to claimant's mental impairments.

(R. 21) (citations omitted).

Contrary to Plaintiff's argument, the ALJ had a valid evidentiary basis for reaching that conclusion. As the ALJ pointed out, Dr. Albert failed to provide any explanation for her opinions in the form report she completed, which greatly diminished the amount of weight to which the opinions were entitled. *See Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) (internal quotation marks omitted) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best . . . [W]here these so-called reports are unaccompanied by thorough written reports, their reliability is suspect."). Moreover, during her course of treatment with Plaintiff, Dr. Albert never reported any clinical findings that supported her opinion that Plaintiff suffered extreme limitations in maintaining social functioning or maintaining concentration, persistence or pace. Nor did Dr. Albert's clinical findings substantiate her opinion that Plaintiff's impairments would result in long absences from work or extended periods of decompensation. Rather, her mental status examinations were consistently relatively normal. Her anxiousness and depressed mood were most often cited as the leading causes of her stress, not her cognitive difficulties. Likewise, Dr. Albert consistently determined that Plaintiff's GAF score was in the moderate range. Furthermore, no other acceptable medical source found that Plaintiff had such extreme limitations. Accordingly, substantial evidence supported the ALJ's decision to reject Dr. Albert's opinions.

b. Dr. Lewis

Plaintiff next contends that the ALJ erred in "reject[ing] Dr. Lewis' findings and opinion

that Plaintiff 'has significant difficulty with sustained attention, distractibility, impulsivity, and difficulty sitting still.'" Pl.'s Br. in Supp. of Mot. for Summ. J. at 12 (quoting R. 18).  As previously discussed, Dr. Lewis performed neuropsychological testing on Plaintiff in mid-June 2010, and Plaintiff attained a full-scale IQ score of 59, which Dr. Lewis noted was "consistent with a diagnosis of mild Mental Retardation." (R. 679).  Dr. Lewis also noted that Plaintiff "likely also has ADHD, combined type.  From early childhood, present in a variety of contexts, she has had significant difficulty with sustained attention, distractability, impulsivity, and difficulty sitting still."  (R. 679).  Moreover, Dr. Lewis explained that Plaintiff's "cognitive functioning is uniformly in the extremely low range.  She does possess the ability to learn provided sufficient repetition and that the content is of low level difficulty.  Communications with her should be kept very simple in terms of vocabulary and sentence structure."  (R. 679).

The Court cannot agree with Plaintiff that the ALJ erred in addressing Dr. Lewis' findings.  First, the ALJ did not simply reject Dr. Lewis' opinion as to Plaintiff's ADHD.  After discussing Dr. Lewis's report and noting that no other mental health provider had made a similar diagnosis of ADHD, the ALJ nevertheless decided to accommodate cognitive deficits related to ADHD in his RFC assessment.  (R. 18).  Plaintiff's argument that the ALJ improperly "rejected Dr. Lewis' objective test results" is also unavailing.  *See* Pl.'s Br. in Supp. of Mot. for Summ. J. at 12.  It is well established that ALJ "is not required to accept a claimant's IQ scores and may reject scores that are inconsistent with the record," so long as his decision to do so is not based "on personal observations of the claimant and speculative inferences drawn from the record." *Markle v. Barnhart*, 324 F.3d 182, 186 (3d Cir. 2003) (internal quotation marks omitted).  Accordingly, in this case, the ALJ was well within his authority to decide that the test results from Dr. Lewis were not controlling.  First, the IQ score of 59, which placed Plaintiff in the

mildly mentally retarded category, was "the product of her first and only meeting with [Dr. Lewis]. A one-time evaluation by a non-treating psychologist is not entitled to controlling weight." *Clark v. Apfel*, 141 F.3d 1253, 1256 (8th Cir. 1998). Second, as the ALJ pointed out, Plaintiff's IQ score of 59 was not consistent with her daily activities and her prior treatment record. As discussed earlier, Plaintiff was not severely restricted in her activities in daily living because of her cognitive difficulties. She graduated from high school and received training to become a nursing assistant. She takes care of herself and her children, though she relies on her now-husband for some assistance. She drives. She goes shopping. She manages her finances. She plays computer games. All of this evidence contradicts a finding that Plaintiff was mildly retarded. Furthermore, up until Dr. Lewis performed the neuropsychological testing in June 2010, no other medical source considered Plaintiff to be mildly mentally retarded. Instead, she was viewed as being in the provisional mild-to-borderline area of functioning. Accordingly, the Court concludes that the ALJ's decision to disregard the Dr. Lewis' IQ results was supported by substantial evidence. In any case, the ALJ incorporated the limitations attributable to Plaintiff's low level of cognitive functioning into his RFC assessment by limiting Plaintiff to jobs involving simple instructions and very simple decision-making—both of which were consistent with Dr. Lewis' determination that Plaintiff could learn content with a low level of difficulty. (R. 18).

c.    Dr. Andrews

Plaintiff argues generally that the ALJ erred in rejecting the opinions of the consultative psychologist, Dr. Andrews, who opined that Plaintiff had moderate restrictions interacting with the public and interacting appropriately with supervisors, and marked restrictions interacting appropriately with co-workers, responding appropriately to work pressures in a usual work setting, and responding appropriately to changes in a routine work setting. (R. 342).

The Court finds that the ALJ sufficiently complied with his obligations under the regulations. An ALJ is "not bound by any findings made by State agency medical or psychological consultants." 20 C.F.R. § 1527(e)(2)(i). However, he must at least consider the consultating examiner's findings. *Id.* When doing so, the ALJ must "evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." *Id.* § 1527(e)(2)(ii).

In reaching his decision, the ALJ considered Dr. Andrews' opinion but concluded that his opinion that Plaintiff had marked limitations in social functioning and responding appropriately to stress were not consistent with the record as a whole. (R. 20). As the ALJ explained, Dr. Andrews' opinions in those two areas were largely based on Plaintiff's subjective reports of anxiety and other symptoms. (R. 20). The suggestion that Plaintiff had marked limitations was also not entirely consistent with Dr. Andrews' own mental status examination findings, which were largely unremarkable, and the other evidence in the record, including Plaintiff's activities and abilities. (R. 20). Furthermore, while the ALJ decided that Plaintiff was not markedly limited in her abilities, his RFC nevertheless reflected those portions of Dr. Andrews' observations that were consistent with the record—namely the Plaintiff's persistent depression and anxiety-related symptoms. (R. 29). Accordingly, the ALJ's treatment of Dr. Andrews' opinion does not warrant a remand.

d. Dr. Nino

Finally, Plaintiff contends that the ALJ erred in determining that Dr. Nino's assessment as to Plaintiff's physical limitations was not entitled to substantial weight. Dr. Nino completed a

medical source statement in August 2010. (R. 396). He concluded that Plaintiff could lift 20 pounds frequently; carry 20 pounds frequently; stand and walk for one hour or less in an eight-hour day; and sit for less than six hours (15 minutes) or sit eight hours with an alternating six/stand option. (R. 396). He also opined that Plaintiff could never stoop or crouch, but could bend frequently, kneel occasionally, balance frequently, and climb occasionally. (R. 397). Moreover, in Dr. Nino's view, Plaintiff should avoid heights, moving machinery, vibrations, and temperature extremes. (R. 397).

As was the case with the other opinion evidence in the record, the Court finds that the ALJ did not err in assessing Dr. Nino's opinion. The ALJ decided not to adopt the sitting, standing, and walking limitations proposed by Dr. Nino because Dr. Nino's assessment was based primarily on Plaintiff's subjective complaints and was inconsistent with the clinical findings. (R. 28). Specifically, Plaintiff was treated rather conservatively for her complaints of pain; her diagnostic studies failed to reveal significant abnormalities; and her primary care physicians consistently recorded unremarkable physical examination findings. Additionally, Dr. Nino himself noted that Plaintiff exhibited intact cranial nerves, normal reflexes, normal sensation, full motor strength; no atrophy; negative straight leg raising; a normal stance; and essentially normal range of motion. (R. 403-04). Because the ALJ considered Dr. Nino's assessment and explained his reason for doings so, he was free to reject it. Furthermore, even if Dr. Nino's assessment would have been fully incorporated into the ALJ's RFC assessment, the occupational base would not have been significantly eroded. To the contrary, the ALJ asked the VE if his testimony would be affected if Plaintiff "would be limited to sedentary work" and had to "avoid heights, vibration, and temperature extremes." (R. 64). In response, the VE explained that Plaintiff could not do the positions he had previously listed (mail clerk, garment sorter,

marker), but she could perform the tasks associated with being a ticket taker (140,000 positions); small parts assembler (225,000 positions); and surveillance system monitor (90,000 positions). (R. 64).

**IV**

**.** **Conclusion**

It is undeniable that Plaintiff has a number of impairments, and this Court is sympathetic and aware of the challenges which Plaintiff faces in seeking gainful employment. Under the applicable standards of review and the current state of the record, however, the Court must defer to the reasonable findings of the ALJ and his conclusion that Plaintiff is not disabled within the meaning of the Act, and that she retained the RFC to perform light work with several limitations as set forth in the ALJ's RFC assessment.

For these reasons, the Court will **GRANT** the Motion for Summary Judgment filed by the Commissioner and **DENY** the Motion for Summary Judgment filed by Plaintiff.

An appropriate Order follows.

McVerry, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GINA MAY HARPER**, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 02:13-cv-446 |
| ) | |
| **CAROLYN W. COLVIN**, ) | |
| ACTING COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

## ORDER OF COURT

    **AND NOW**, this –th day of March, 2014, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED, ADJUDGED, AND DECREED** that:

    1.    Defendant's Motion for Summary Judgment is **GRANTED**.

    2.    Plaintiff's Motion for Summary Judgment is **DENIED**.

    3.    The Clerk will docket this case as closed.


                      BY THE COURT:


                      s/ Terrence F. McVerry
                      United States District Judge


cc:    H. Brian Peck
       **Email:** brian@crossroadslaw.com

       Christy Wiegand
       **Email:** christy.wiegand@usdoj.gov